1   LAURA PALAZZOLO, CA STATE BAR NO. 210954
    LINCOLN LAW SCHOOL OF SAN JOSE
2   384 S. SECOND STREET
    SAN JOSE, CA 95113
3   TELEPHONE: (408) 977-7227
    FACSIMILE: (408) 977-7228
4   Email: dean@lincolnlawsj.edu

5   ATTORNEYS FOR PLAINTIFF
    LINCOLN LAW SCHOOL OF SAN JOSE
6

7

8                   UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10                        SAN JOSE DIVISION

11  LINCOLN LAW SCHOOL OF SAN JOSE,          CASE NO.
    a California nonprofit corporation
12                                           COMPLAINT FOR DAMAGES,
              Plaintiff,                      INJUNCTIVE AND DECLARATORY
13                                           RELIEF PURSUANT TO:
                 vs.
14                                           1)  FIRST AMENDMENT
    THE STATE BAR OF CALIFORNIA, a           2)  SHERMAN ANTITRUST ACT
15  California public company; JOHN F.       3)  CLAYTON ACT
    KENNEDY UNIVERSITY, a California         4)  UNFAIR BUSINESS PRACTICES
16  nonprofit corporation; NATIONAL
    UNIVERSITY, a California nonprofit
17  corporation; MONTEREY COLLEGE OF
    LAW, a California nonprofit corporation;
18  GEORGE LEAL, an individual; MITCHEL
    L. WINICK, an individual; DEAN
19  BARBIERI, an individual; and DOES 1
    through 20, inclusive,
20
              Defendants.
21

22

23        Plaintiff, LINCOLN LAW SCHOOL OF SAN JOSE ("LINCOLN"), complaining against

24  Defendants, THE STATE BAR OF CALIFORNIA ("STATE BAR"); JOHN F. KENNEDY

25  UNIVERSITY ("JFKU"); NATIONAL UNIVERSITY ("NU"); MONTEREY COLLEGE OF

26  LAW ("MCL"); GEORGE LEAL ("LEAL"); MITCHEL L. WINICK ("WINICK"); and DEAN

27  BARBIERI ("BARBIERI"), alleges:

28
                                    -1-

**JURISDICTION**

1. Jurisdiction is conferred on this Court by 28 U.S.C. § 1331.

2. This Court has original jurisdiction over Plaintiff's First Claim under the First Amendment to the United States Constitution.

3. This Court has original jurisdiction over Plaintiff's Second Claim under 15 U.S.C. §§ 1and 2 (the "Sherman Act").

4. This Court has original jurisdiction over Plaintiff's Third Claim under 15 U.S.C. § 12 et seq. (the "Clayton Act").

5. Plaintiffs Fourth Claim is so related to Plaintiff's First through Third Claims that all such claims form part of the same case or controversy under Article III of the Constitution.

6. The jurisdiction of this Court as to the Fourth Claim is based on 28 U.S.C § 1367(a).

7. Plaintiff recognizes that the STATE BAR is a state actor. To the extent this Court cannot enter judgment as to one or more claims, Plaintiff requests that such matters be bifurcated, subject to an *England* reservation.

**VENUE**

8. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants STATE BAR OF CALIFORNIA, JOHN F. KENNEDY UNIVERSITY, MONTEREY COLLEGE OF LAW, GEORGE LEAL, MITCHEL L. WINICK, and DEAN BARBIERI reside in, or have their principal places of business in, this District; because all Defendants reside in the State of California; and because a substantial part of the events giving rise to the Claims occurred in this District.

**THE PARTIES**

9. Plaintiff LINCOLN is, and at all times relevant herein was, a nonprofit corporation duly organized and existing under the laws of the State of California, with its principal place of business in San Jose, California.

10. Defendant STATE BAR is, and at all times relevant herein was, a California public corporation, with its headquarters in San Francisco, California.

11.     Defendant JFKU is, and at all times relevant herein was, a nonprofit corporation duly organized and existing under the laws of the State of California, with its principal place of business in Pleasant Hill, California.

12.     Defendant NU is, and at all times relevant herein was, a nonprofit corporation duly organized and existing under the laws of the State of California, with its headquarters in La Jolla, California.

13.     Defendant MCL is, and at all times relevant herein was, a nonprofit corporation duly organized and existing under the laws of the State of California, with its principal place of business in Seaside, California.

14.     Defendant LEAL is, and at all times relevant herein was, an individual resident of the State of California.  Plaintiff is informed and believes that LEAL resides in San Francisco County.  At all times relevant herein, LEAL was a Program Manager for the STATE BAR, responsible for making recommendations relating to JFKU and MCL's accreditation and law school programming.

15.     Defendant WINICK is, and at all times relevant herein was, an individual resident of the State of California.  Plaintiff is informed and believes that WINICK resides in Monterey County.  WINICK is the Dean of MCL.

16.     Defendant BARBIERI is, and at all times relevant herein was, an individual resident of the State of California.  Plaintiff is informed and believes that BARBIERI resides in Contra Costa County.  BARBIERI is the Dean of the John F. Kennedy University College of Law ("JFKUCOL") currently located on JFKU's Pleasant Hill, CA campus.

17.     The true names or capacities, whether individual, corporate, associate, or otherwise, of defendants DOE 1 through DOE 20 are unknown to LINCOLN, who therefore sues defendants by such fictitious names, and will amend this complaint to show their true names and capacities when ascertained.  LINCOLN is informed and believes and thereon alleges that each of the defendants designated as a DOE is responsible in some manner for the causes of action herein referred to and thereby proximately caused and continue to cause injuries and damages to LINCOLN as herein alleged.  The STATE BAR, JFKU, NU, MCL, LEAL, WINICK, and

1  BARBIERI and these DOE defendants are hereinafter collectively referred to as the

2  "DEFENDANTS."

3      18.    LINCOLN is informed and believes and thereon alleges that at all times herein

4  mentioned each of the DEFENDANTS was the agent and/or employee of each of the remaining

5  DEFENDANTS, and in doing the things hereinafter alleged, was acting in the course and scope of

6  such agency and/or employment.

7  **PRELIMINARY ALLEGATIONS**

8      19.    The STATE BAR of California was created by the legislature as an administrative

9  arm of the California Supreme Court.  Its actions result in recommendations to the Supreme Court

10  (i.e., whether to disbar an attorney), and are therefore quasi-judicial in nature.  Its powers are

11  circumscribed by both the legislature and the court.  Plaintiff believes that, unless retrained by this

12  Court, STATE BAR intends to, and will, act in excess of clearly articulated state policy and

13  without active supervision by a state official.  The STATE BAR is therefore not immune from

14  antitrust liability.

15      20.    The Committee of Bar Examiners ("CBE") is a committee of the STATE BAR.

16  The STATE BAR's Board of Trustees has delegated to the CBE the authority to oversee the

17  requirements for admission to practice law in California, as an adviser to the California Supreme

18  Court.

19      21.    The CBE is made up of 19 members appointed by the State Bar Board of Trustees,

20  the governor, the speaker of the state Assembly and the Senate rules committee. It meets six to

21  eight times a year to consider new policies and review procedures for law schools and admissions

22  rules.  At all times relevant herein, the CBE consisted of ten attorneys (members of the STATE

23  BAR), and nine non-attorney members of the public.

24      22.    In or about 2009, an Advisory Committee on California Accredited Law School

25  Rules to the Committee of Bar Examiners, colloquially known as the Rules Advisory Committee

26  ("RAC") was formed.  According to the Functions and Procedures of the Advisory Committee

27  ("Functions and Procedures"), the RAC is composed of six members:  three elected by the

28

-4-

California Accredited Law School ("CALS") deans, and three appointed by the chair of the CBE. The CALS are market participants in legal education, which is the filed the CBE regulates.

23.    The RAC proposes new Accredited Law School Rules ("Rules") and Guidelines for Accredited Law School Rules ("Guidelines") to the CBE.  However, the CBE may not enact any Rules or Guidelines without first obtaining a "recommendation" from the RAC.  Though the CBE has the power to reject a "recommendation" from the RAC for a new Rule or Guideline, Plaintiff is informed and believes that the CBE has never actually done so.

24.    The makeup of the RAC gives the CALS veto power over which Rules and Guidelines the CBE may consider, and in what form.  This veto power confirms that a controlling number of decision-makers are active market participants at the RAC level.  The fact that the CBE consists of a majority of attorneys, who have a vested interest in law school regulation as it affects the number of competing lawyers in the marketplace, results in a second level of controlling market participants.  Thus both the RAC and the CBE must be actively supervised by a state official to qualify for immunity from antitrust liability.

25.    Plaintiff is informed and believes that LEAL and BARBIERI have been friends since law school (in excess of 30 years).  Plaintiff is informed and believes that while BARBIERI was employed by the STATE BAR, BARBIERI recommended that LEAL be hired into LEAL's position as Program Manager.  Plaintiff is informed and believes that BARBIERI and LEAL continued to meet thereafter on a regular basis in continuance of their personal relationship. Plaintiff is informed and believes that this inherent conflict of interest caused the Director of Admissions, Gayle Murphy, to remove LEAL from accreditation site visits to JFKUCOL.

26.    As Program Manager, LEAL, at all relevant times herein, was the sole staff member at the STATE BAR making recommendations with respect to accreditation matters relating to CALS, including JFKUCOL and MCL.  Plaintiff is informed and believes that LEAL did not disclose his personal relationship with BARBIERI when making recommendations to the CBE regarding JFKUCOL accreditation requests.

27.    Plaintiff is informed and believes, and on that basis alleges, that LEAL received significant remuneration from WINICK and BARBIERI in the form of meals and entertainments

-5-

1   which LEAL did not report, and which were not disclosed to the CBE in connection with LEAL's

2   recommendations on behalf of MCL and JFKUCOL.

3       28.     According to NU's website, in or about April of 2009, JFKU became an affiliate

4   institution of NU, and part of the National University System.  Plaintiff is informed and believes

5   that JFKU and NU have entered into agreements which provide certain benefits to NU from its

6   affiliation with JFKU, and vice-versa.  Plaintiff is informed and believes and thereon alleges that

7   JFKUCOL is therefore an integral part of NU's strategic planning initiatives, including initiatives

8   for growth and revenue.

9       29.     According to its website, NU has 45 locations throughout the state of California,

10  plus additional locations in four other states.  The NU website does not identify the addresses

11  currently occupied by JFKU as JFKU campuses.  The Pleasant Hill JFKU location at 100

12  Ellinwood Way is identified on the website as the National University East Bay Campus.  As of

13  March 17, 2018, the NU website indicated NU will be adding additional programs soon at this

14  "new" location.  The JFKU San Jose location at 3031 Tisch Way is identified as National

15  University's San Jose Campus.  The pictures of the building on the NU website no longer include

16  the JFKU logo.  Instead, the building has a National University logo.

17      30.     Similarly, JFKU's website includes National University locations, including a

18  Student Success Center dedicated to recruiting both JFKU and NU students.  Plaintiff believes the

19  JFKU campuses have been rebranded in furtherance of the combination between JFKU and NU to

20  take advantage of the JFKUCOL branch campus expansion, such that JFKUCOL branch campuses

21  may trade on NU's superior marketing power and name recognition to help put competing schools

22  near branch campus locations out of business.

23      31.     In its Statement of Information, filed with the California Secretary of State, JFKU

24  lists Dave Lawrence as its Chief Financial Officer.  Dave Lawrence is also NU's Chief Financial

25  Officer.  Plaintiff is therefore informed and believes that JFKU and NU, though separate entities,

26  are both financially and operationally intertwined.

27

28

32.     The JFKU system includes three campuses (Pleasant Hill, San Jose, and Berkeley, California), plus additional counseling centers in Concord, Oakland and Sunnyvale, California. The three campuses include numerous bachelors, masters and doctoral degree programs.

33.     JFKUCOL (a CBE-accredited school (CALS)) located at JFKU's Pleasant Hill location.  Plaintiff is informed and believes that JFKU and JFKUCOL are both operationally and financially intertwined.  JFKUCOL does not appear to be separately incorporated.

34.     JFKU's bachelors, masters, and non-Juris Doctor doctoral degree programs are not accredited by the CBE, but are imbued with the imprimatur of the STATE BAR because they are conferred by a CALS.  Giving JFKU and NU students the ability to advance seamlessly from their NU undergraduate and master's studies to a JFKUCOL juris doctor by combining programs at NU's existing facilities will provide a significant market advantage to JFKU and NU's unaccredited programs.  The revenues from these California programs may be used to support NU's campuses in four other states, thus affecting interstate commerce.  Plaintiff is informed and believes that NU's out of state students will also be able to access JFKUCOL's online programming, and vice-versa.  A new Guideline is currently being proposed that would allow NU's undergraduate students to receive credit for JFKUCOL classes without having to matriculate as a JFKUCOL student.

## FIRST CLAIM FOR RELIEF

### (VIOLATION OF FIRST AMENDMENT RIGHT TO PETITION)

### (against Defendants STATE BAR, LEAL, WINICK, AND BARBIERI)

35.     LINCOLN hereby refers to and realleges paragraphs 1-32 (inclusive) and incorporates them by reference as though fully set forth at length herein.

36.     The RAC is composed of three CALS deans, elected by the CALS, and three members of the CBE, acting as agents of the STATE BAR.

37.     Because the CALS deans, as market participants, elect the RAC members, they control the issues that come before the RAC.  This is so because they will not elect CALS deans whose ideas and programs are not generally popular.  Since the CALS RAC members have the power to decide which new Rules and Guidelines are considered by the RAC, no proposed rule or

guideline that is not pre-approved by the majority of the market participants will be considered. The CALS therefore are the first line of defense against any proposed Rule or Guideline that might be in the best interest of a disfavored dean, but not in the best interests of favored deans, who tend to be elected to the RAC.  WINICK and BARBIERI have bullied the CALS deans into submission, such that all of WINICK and BARBIERI's requested Rules and Guidelines, and amendments thereto, are taken up by the RAC and approved by the CBE on the RAC's recommendation.

38.     According to CBE procedures, the CBE may not adopt a new Rule or Guideline, or make an amendment to an existing Rule or Guideline, without first obtaining a "recommendation" from the RAC.  Thus it is impossible for a disfavored dean to submit a requested Rule or Guideline directly to the CBE, as the CBE will be unable to act on it independently.

39.     Since there are three CALS deans on the RAC, they retain veto power.  No recommendation will pass through the RAC to the CBE without a majority vote, so at least one market participant (CALS dean) must vote in favor.  Therefore, a disfavored dean's proposed Rule or Guideline, even if submitted directly to the CBE, will not be approved by the RAC and therefore cannot be independently approved by the CBE.

40.     There is no workaround to the RAC's stranglehold on the CBE, which acts as an impermissible restraint on the ability for a disfavored CALS, such as LICNOLN, to petition the CBE directly for redress.

41.     LEAL, as an agent of the STATE BAR, was, at all times relevant herein, the sole staff member assigned to consider and recommend requests for waivers from the Rules and Guidelines.  He also supervises school site visits, which determine a CALS ongoing accreditation. LEAL also assists the other DEFANDANTS in drafting proposed new Rules and Guidelines.  He is a long-time friend of BARBIERI and has been frequently entertained by WINICK such that WINICK and BARBIERI's views are his views.  He therefore also acts as a barrier to a disfavored dean's petition for redress because without his "recommendation" the CBE will not approve a request from a CALS.  Indeed, LEAL has publicly stated that he has dissuaded some schools from petitioning the CBE for programs that he has recommended on behalf of other schools.  Plaintiff is informed and believes that the schools were dissuaded from petitioning by LEAL's assertion

-8-

that he would not recommend the relief.  Plaintiff is informed and believes that LEAL withheld his recommendation because the relief requested was opposed by WINICK and BARBIERI.  Since LEAL was the only staff member assigned to review and recommend, and since angering him could result in future action against the school in the context of a site visit or otherwise, LEAL acts as a further impermissible restraint on the ability of a disfavored CALS to petition the CBE directly for redress.

42.     CALS who wish to oppose the Rules and Guidelines promulgated by the RAC may be limited by the RAC and STATE BAR agendas to "public comment," and such comment may be limited to as little as three minutes, at the discretion of the Committee chair.  WINICK, BARBIERI, and LEAL control the RAC, either directly or indirectly, and may therefore influence the recognition given to disfavored CALS.  The STATE BAR controls the CBE meetings.

43.     The STATE BAR has been apprised of the conflicts of interest with respect to LEAL, WINICK, and BARBIERI, and with respect to their control of the RAC, but continue to allow the restraints on Plaintiff's right to petition at each and every STATE BAR meeting.

44.     Recently, LINCOLN sought information related to these conflicts of interest and other matters relevant to these proceedings through the Public Records Act.  The STATE BAR Office of General Counsel has withheld documents, and affirmatively stated they will not be available until after the hearings to approve the branch campus requests – which the STATE BAR hopes will render LINCOLN's arguments moot.

45.     The STATE BAR has also affirmatively prevented LINCOLN from submitting materials to the CBE members prior to hearing dates, such that the members have no time to read and digest LINCOLN's point of view, even when one has requested to be able to do so.  LINCOLN's oral comments at a February 20, 2018 hearing were cut short by the STATE BAR after less than a minute, although all other speakers on the subject were allowed to complete their comments of extended length.  Thereafter a policy preventing "public comment" of more than 3 minutes was established, which Plaintiff believes will be used to prevent LINCOLN from being heard in full at the upcoming March 23, 2018 CBE meeting.

46.     As a result of these restraints on the right to petition for redress, LINCOLN and others have been prevented from presenting their views, and from participating meaningfully in the creation of the Rules and Guidelines which the DEFENDANTS now seek to use against LINCOLN to destroy its business.   LINCOLN has been damaged, and will be damaged, in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**

**(VIOLATION OF SHERMAN ANTITRUST LAWS – 15 U.S.C. §§ 1 and 2)**

**(against ALL Defendants)**

47.     LINCOLN hereby refers to and realleges paragraphs 1-46 (inclusive) and incorporates them by reference as though fully set forth at length herein.

48.     Plaintiff is informed and believes that in or about 2013, San Francisco Law School, an affiliate of Alliant University, sought permission from the CBE to open a "branch" law school at one of Alliant's campuses located in San Diego, California.   Plaintiff is informed and believes that Jane Gamp was the dean of San Francisco Law School at the time and also a member of the RAC.  Plaintiff is informed and believes that Dean Gamp used her position on the RAC to propose new Rules and Guidelines that would exempt "branch" campuses from compliance with the same requirements with which new or existing CALS were required to comply.   LEAL, WINICK and BARBIERI assisted in this effort.   CBE members, through their participation on the RAC, assisted in this effort.   That assistance, and the subsequent approvals elicited from the CBE, were outside of the STATE BAR's statutory authority.

49.     Plaintiff is informed and believes that BARBIERI informed JFKU and NU about the pending branch campus Rules and Guidelines.  Plaintiff is informed and believes that thereafter JFKU and NU conspired to use BARBIERI's association with JFKUCOL as a tool to monopolize the CALS system, and thereby the market in CALS legal education, by locating a branch campus of JFKUCOL at each of JFKU's and NU's locations throughout California.   Pursuant to this combination and conspiracy, BARBIERI was instructed to, and did, participate in the drafting of the Guidelines to make sure they would allow JFKUCOL to locate a branch campus at any JFKU

COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF

or NU location without inquiry as to the nature or quality of the campus, or the involvement (financial or otherwise) of the unaccredited entities.

50.     Plaintiff is informed and believes, and on that basis alleges, that, further to this conspiracy, BARBIERI recruited LEAL and WINICK to assist him in amending the Rules and Guidelines pertaining to branch campuses, so that the form of Rules and Guidelines BARBIERI required for JFKU and NU would be pushed through the RAC, and recommended by a staff member to the CBE for approval.

51.     Plaintiff is informed and believes and thereon alleges that, in furtherance of the conspiracy, BARBIERI promised MCL exclusive territories (that NU would not locate its branch campuses where an MCL campus existed).

52.     Pursuant to the new branch campus rules and guidelines (crafted by LEAL, BARBIERI, and WINICK in combination with the STATE BAR and the RAC), branch campuses are exempted from the first year law students examination, are exempted from site visits for at least two years, may combine their bar pass rate statistics (thereby concealing the failures of specific campuses), may share a dean, registrar, and faculty among an unlimited number of campuses, and may obtain approval for online and other programming for *all* campuses upon the self-serving letter certification of the dean of the main campus.

53.     By approving the branch campus guidelines, the CBE relinquished its discretion in the accreditation of branch campuses.  The market participants who crafted the branch campus guidelines now assert that the CBE must accredit a branch campus upon the certification of a CALS dean, without inquiry.  In relinquishing its accreditation function, at the behest of, and in combination with, active market participants, the CBE impermissibly ceded its regulatory authority to active market participants, and combined with the other DEFENDANTS to adopt instead the ministerial function of approving what may amount to misrepresentations or omissions by the submitting CALS.  This relegation of authority is in direct contravention of clearly articulated state policy without active supervision by a state official.  The STATE BAR's actions in colluding with the other DEFENDANTS in restraint of trade and to advance their monopoly are therefore not subject to antitrust immunity.

-11-

54.   These exemptions from the Rules and Guidelines applicable to new schools attempting to enter the CBE accredited market, and existing accredited CALS schools, provide significant cost savings and market advantages to JFKU and NU when they open branch campuses through JFKUCOL, as opposed to having to request approval for each new campus as a separate new law school.   JFKU, NU, MCL, WINICK, LEAL, and BARBIERI, along with the RAC (including its CBE members, acting on behalf of the STATE BAR) conspired to provide these market advantages.

55.   Because the branch campus rules and guidelines were crafted to allow for the opening of a branch campus solely upon the certification of a CALS dean that such campus will eventually be "substantially compliant" with the Rules and Guidelines applicable to existing CALS, the potential exists for BARBIERI to single-handedly certify, as the dean of JFKUCOL, that all of the JFKU and NU locations "will be compliant" such that NU could (instantly, or over time) dominate the CALS market with 45 locations.   In furtherance of this mission, BARBIERI requested that he be, and he was, placed on the RAC. During his tenure, the RAC will define what it means for all of the JFKU/NU campuses to be "substantially compliant" as set forth in the branch campus Guidelines.

56.   Because of NU's resources, Plaintiff is informed and believes that JFKU and NU conspired to constrain and then dominate the market for the purpose of controlling the pricing for legal education, such that existing CALS (constrained by the costs of fully complying with all of the Rules and Guidelines, while NU branch campuses are exempt) would be eliminated. Moreover, any new competitors would be prevented from entering the market by the high costs and time-consuming nature of the site inspections, staffing requirements, first year law students examination compliance and disclosure rules, and other barriers to entry not applicable to branches.

57.   The combination of JFKU and NU's extensive capital (including marketing dollars and the sheer number of campuses throughout the state) combined with JFKUCOL's status as a CALS (making unlimited branch campuses available at below market operational cost) is intended

1   to, and will, restrain trade and ultimately raise prices and monopolize the market to the detriment

2   of consumers of legal education throughout the state.

3       58.    Plaintiff is informed and believes, and on that basis alleges, that BARBIERI and

4   WINICK thereafter agreed that MCL would request to open branch campuses in areas without an

5   existing CALS in order to establish the application of the new branch campus Rules and Guidelines

6   under circumstances where no anticompetitive objection would be raised.

7       59.    Thereafter, in or about January of 2018, BARBIERI submitted a Major Change

8   Request to locate a JFKUCOL branch campus at JFKU's San Jose campus. Pursuant to the Rules

9   and Guidelines, this location would allow two unaccredited multi-campus commercial enterprises

10   (JFKU and NU) to use the special branch campus rules to gain a market advantage over existing

11   CALS schools, including LINCOLN. In addition, these unaccredited university entities will profit

12   from the CALS marketplace without having to meet the same requirements as all other

13   unaccredited schools seeking to enter the accredited school market would have to meet. And NU's

14   students in other states will benefit from the educational programming that JFKUCOL will be able

15   to create pursuant to its market advantages, and the new undergraduate credit Guidelines now

16   being proposed.

17       60.    In or about February of 2018, MCL also submitted a Major Change Request to

18   locate a branch campus near LINCOLN. This MCL branch campus would be near enough to the

19   requested JFKUCOL branch campus to benefit from NU's extensive marketing resources, and to

20   assist NU in removing LINCOLN from the CALS market in the south Bay Area. Plaintiff therefore

21   believes this additional MCL branch campus in Santa Cruz is also part of the conspiracy to assist

22   JFKU and NU in monopolizing the CALS marketplace.

23       61.    In or about February of 2018, MCL submitted a Major Change Request to the CBE

24   for the purpose of obtaining permission to establish a hybrid online juris doctor program. Such

25   programs have not been approved by the California legislature or the California Supreme Court.

26   To date, online law degree programs have only been registered, but not accredited, by the CBE.

27   Such programs exceed the parameters of the current Rules and Guidelines, which limit accredited

28

1   law schools to twelve total units of distance learning.  A full juris doctor program must exceed 80

2   units of instruction.

3        62.    Plaintiff is informed and believes, and on that basis alleges, that MCL's request

4   for an online program of instruction is in furtherance of the JFKU/NU/JFKUCOL/MCL conspiracy

5   to restrain trade and monopolize the CALS market in that, just as MCL agreed to open branch

6   campuses in remote and uncontested locations to test the new Guidelines and set their application

7   parameters before JFKUCOL submitted its proposal for the same, Plaintiff believes MCL is testing

8   the online education rules in advance of JFKUCOL requesting the same relief from the Guidelines

9   to use NU's nationwide online technologies in all of its 45 potential branch campus locations to

10   further strangle existing CALS and establish a state-wide monopoly.

11        63.    LINCOLN files this Complaint seeking immediate injunctive relief and a

12   declaration that the branch campus Guidelines are anticompetitive as a matter of law.  LINCOLN

13   will seek leave to amend its Complaint to allege treble damages if the injunction is not granted and

14   the conspiracy is allowed to proceed.

15   **THIRD CLAIM FOR RELIEF**

16   **(VIOLATION OF CLAYTON ACT – 15 U.S.C. § 12 et seq.)**

17   **(against ALL Defendants)**

18        64.    LINCOLN hereby refers to and realleges paragraphs 1-63 (inclusive) and

19   incorporates them by reference as though fully set forth at length herein.

20        65.    The purpose of the Clayton Act is to nip monopolies in the bud.  While its focus is

21   on competition generally, it is intended to protect viable, locally owned small businesses from acts

22   which may not yet violate the Sherman Act, and thereby discourage combinations and conspiracies

23   in restraint of trade from forming.  Therefor the test for measuring the legality of any particular

24   economic arrangement under the Clayton Act will be less stringent than under the Sherman Act.

25        66.    There are currently 15 accredited CALS schools in the CALS system.  The CALS

26   fill a particular need in the provision of legal education in that their Juris Doctor programs

27   generally cost less than half what a degree from an American Bar Association (ABA) school

28   would cost.  In addition, the CALS provide opportunities for students who, for reasons of age or

-14-

1  standardized test scores, or myriad other reasons, are not accepted to, or choose not to attend, an

2  ABA school.

3      67.    Because the CALS schools provide opportunities to students who might otherwise

4  be unable to access a legal education, the CALS students sometimes include vulnerable

5  populations.  In addition, the programming at each CALS school may need to be adjusted to

6  accommodate the student population represented at each individual school.

7      68.    The conspiracy, as described above, between JFKU, NU, JFKUCOL, MCL,

8  WINICK, and BARBIERI (collectively, the "NU DEFENDANTS") to use JFKUCOL's status as

9  an accredited CALS to obtain accreditation for all 45 NU and JFKU locations as branch campuses

10  threatens to monopolize and overpower the 15 CALS, flood the system with inexpensive online

11  and unaccredited non-juris doctor degrees which the STATE BAR has allowed or will allow

12  JFKUCOL to offer, put the existing CALS out of business and thereby remove choices and

13  monopolize trade to the detriment of the consumers of legal education in this State.

14      69.    A monopoly may be formed all at once (as with a merger) or one location at a time

15  (a "creeping monopoly").  If the STATE BAR is permitted to approve the pending JFKUCOL and

16  MCL Major Change Requests for branch campuses in San Jose and Santa Cruz, respectively, under

17  the current "no look" branch campus Guidelines, it will be obligated to allow other schools to open

18  branch campuses under those same Rules and Guidelines or else discriminate against other schools

19  seeking to take advantage of the same "no look" opportunities.  It is therefore critical that this

20  Court issue an injunction to prevent the application of the current Rules and Guidelines to any

21  branch campus location until the Constitutionality and antitrust issues inherent in the creation of

22  the Rules and Guidelines, by the very market participants seeking to enforce the same, may be

23  adjudicated.

24      70.    LINCOLN files this Complaint seeking immediate injunctive relief and a

25  declaration that the branch campus Guidelines are anticompetitive as a matter of law.  LINCOLN

26  will seek leave to amend its Complaint to allege treble damages if the injunction is not granted and

27  the conspiracy is allowed to proceed.

28                    **FOURTH CLAIM FOR RELIEF**

**(VIOLATION OF CARTWRIGHT ACT – Bus. & Prof. Code §§ 16700 et seq.)**

**(against ALL Defendants)**

71.     LINCOLN hereby refers to and realleges paragraphs 1-70 (inclusive) and incorporates them by reference as though fully set forth at length herein.

72.     As noted above, there are currently 15 accredited CALS schools in the CALS system, which schools fill a particular need in the effort to diversify the legal profession in this State.

73.     The conspiracy between JFKU, NU, JFKUCOL, MCL, WINICK, and BARBIERI (collectively, the "NU DEFENDANTS") to use JFKUCOL's status as an accredited CALS to obtain accreditation for all 45 NU and JFKU locations as branch campuses threatens to monopolize and overpower the 15 CALS, flood the system with inexpensive online and non-juris doctor degrees which the STATE BAR has allowed or will allow JFKUCOL to offer, put the existing CALS out of business and thereby unlawfully restrain trade to the detriment of the consumers of legal education in this State.

74.     In furtherance of this conspiracy, MCL requested and received permission to open branch campuses in San Luis Obispo and Bakersfield, and has requested a third branch campus in Santa Cruz.  These requests were intended to, and did, prime LEAL and the CBE to establish a "no look" application of the Rules and Guidelines that could then be applied to a request to establish each and every branch campus at a JFKU or NU location.  In continuance of the creeping monopoly, JFKUCOL has now requested a branch campus at a JFKU campus in San Jose, the allowance of which will prime the CBE to allow the 44 other NU campuses under the same "no look" principles in areas where other CALS exist.

75.     Further, as set forth above, the combination of LEAL and the CBE members of the RAC, conspiring with WINICK, BARBIERI, and the other CALS members on the RAC to promote the Rules and Guidelines requested by the favored deans, and to preclude, by intimidation, those requested by LINCOLN and other disfavored CALS, as described above, further restrains trade.  The DEFENDANTS used this conspiracy to promote the Rules and Guidelines which would

1     allow them to open their branch campuses on a "no look" basis, and to prevent disfavored CALS

2     from being heard in opposition.

3         76.    Petitioning the CBE directly for rules, guidelines and waivers for the benefit of their

4     specific student populations is permissible.  However, the combination at issue here operated by

5     way of intimidation and threat, and the systemic suppression of First Amendment rights.  Any

6     CALS desiring a new guideline or rule to advance its business objectives must first survive the

7     intimidation and veto of the CALS deans, then the further veto of the RAC, which is controlled by

8     the CALS.  The requesting CALS is unable to petition directly because the CBE must request

9     permission from the RAC to enact legislation.  The DEFENDANTS agreed to the creation of the

10    system, and continue to conspire in its operation with the intent to, and with the purpose of,

11    restraining trade.  These agreements have the ability to further the purposes of the monopolizing

12    entities and prevent dissenters from opposing the monopolization – all to the detriment of the

13    students of the disfavored CALS, as well as the entire population of consumers and potential

14    consumers of legal education in California.

15        77.    As a disfavored CALS, LINCOLN has suffered and will continue to suffer damages

16    as a result of its inability to directly petition the CBE for redress.  Further, as a CALS, LINCOLN

17    will suffer irreparable damage from the NU DEFENDANTS' conspiracy to flood the market with

18    JFKUCOL branch campuses, including one in San Jose that specifically threatens LINCOLN

19    students.

20        78.    LINCOLN files this Complaint seeking immediate injunctive relief and a

21    declaration that the branch campus Guidelines are anticompetitive as a matter of law.  LINCOLN

22    will seek leave to amend its Complaint to allege treble damages if the injunction is not granted and

23    the conspiracy is allowed to proceed.

24                              **FIFTH CLAIM FOR RELIEF**

25        **(UNFAIR BUSINESS PRACTICES- CA Bus and Prof §17000 et. seq.,  §17200)**

26                          **(against JFKU, NU, and MCL)**

27        79.    LINCOLN hereby refers to and realleges paragraphs 1-78 (inclusive) and

28    incorporates them by reference as though fully set forth at length herein.

80.   As detailed herein, since 2014 and up to the present time, DEFENDANTS, and each of them, combined, conspired and agreed together, and continue to combine, conspire and agree at joint meetings to establish Rules and Guidelines to the exclusion of certain members of the market, including LINCOLN, and to the benefit of others, including JFKUCOL and MCL.

81.   In furtherance of this unlawful combination, conspiracy, and agreement, the CALS (as an association of market participants, including WINICK and BARBIERI), LEAL, and the RAC (an association of market participants, including members of the CBE who are also market participants and agents of the STATE BAR) retained veto power over which Rules and Guidelines, and in what form, could be adopted by the CBE, thus restraining the ability of disfavored CALS, like LINCOLN, from proposing rules that would benefit the disfavored CALS, thereby unlawfully restraining trade.

82.   In furtherance of this unlawful combination, conspiracy, and agreement, DEFENDANTS, and each of them, encouraged individual members of the CALS, the RAC and the CBE to refuse to cooperate with or share information with the disfavored deans, including LINCOLN.   Plaintiff is informed and believes that LEAL made knowing and affirmative misrepresentations to the CBE in favor of BARBIERI and against LINCOLN.  The STATE BAR Office of General Counsel affirmatively withheld documents, and refused to timely disseminate LINCOLN's information to the CBE in an effort to advance the NU DEFENDANTS' monopoly over LINCOLN's objection.

83.   As detailed herein, all DEFENDANTS committed and continue to commit unlawful, unfair, or fraudulent business acts and practices to the detriment of LINCOLN, and in violation of California Business and Professions Code Section 17200, *et. seq.*  These business acts and practices include, but are not limited to: (a) conspiring to, and entering into agreements that, prevent LINCOLN and other disfavored deans from petitioning the CBE for redress; (b) conspiring to, and entering into agreements that, allow JFKUCOL's accreditation status to be used for the commercial benefit of an unaccredited, non-market participant, in violation of the Sherman Antitrust Laws;   (c) conspiring to, and entering into agreements that, use the NU and JFKU

1  campuses to monopolize the CALS system in violation of the Clayton Act; and (d) conspiring to,

2  and entering into agreements that, restrain trade in violation of the Cartwright Act.

3      84.    By reason of all DEFENDANTS' unlawful, unfair or fraudulent business acts and

4  practices, LINCOLN has been, and will be, deprived of money and property. LINCOLN has a

5  direct possessory interest in the money and property alleged, including monies that

6  DEFENDANTS wrongfully obtained or will obtain as a result of their unlawful, unfair or

7  fraudulent conduct.

8      85.    LINCOLN is informed and believes and thereon alleges that all DEFENDANTS

9  committed the above-mentioned acts with the intention of causing economic injury to LINCOLN.

10     86.    As a direct and proximate result of the conduct of DEFENDANTS and each of

11 them, LINCOLN has suffered and continues to suffer substantial damages, and has incurred other

12 and further damages that LINCOLN has not determined at this time. LINCOLN will seek leave to

13 amend this complaint to state the sums with specificity when known. LINCOLN further requests

14 that its damages be trebled in accordance with Bus. & Prof. Code, § 17537.4.

**SIXTH CLAIM FOR RELIEF**

**(INJUNCTIVE RELIEF- CIV. CODE §3423(e), CODE CIV. PROC. §526(a)(1))**

17     87.    LINCOLN hereby refers to and realleges paragraphs 1-86 (inclusive) and

18 incorporates them by reference as though fully set forth at length herein.

19     88.    As detailed herein, all DEFENDANTS committed and continue to commit

20 unlawful, unfair, or fraudulent business acts and practices to the detriment of LINCOLN, and in

21 violation of California Business and Professions Act Section 17200, *et. seq.*  These business acts

22 and practices include, but are not limited to: (a) conspiring to, and entering into agreements that,

23 prevent LINCOLN and other disfavored deans from petitioning the CBE for redress; (b) conspiring

24 to, and entering into agreements that, allow JFKUCOL's accreditation status to be used for the

25 commercial benefit of an unaccredited, non-market participant, in violation of the Sherman

26 Antitrust Laws;  (c) conspiring to, and entering into agreements that, use the NU and JFKU

27 campuses to monopolize the CALS system in violation of the Clayton Act; and (d) conspiring to,

28 and entering into agreements that, restrain trade in violation of the Cartwright Act.

-19-

89.     As a direct consequence of the acts of DEFENDANTS, and each of them, competition among the CALS has been restrained, suppressed, and eliminated, and the consumers of legal education have been deprived of the benefit of such programs and educational benefits as might have been, or might be, proposed by the disfavored CALS.

90.     DEFENDANTS continuing wrongful conduct as alleged above, unless restrained by this Court, will cause great and irreparable harm to LINCOLN, to the disfavored CALS, and to the consumers of legal education in this State, who have been deprived of a free market.

91.     Plaintiff (and the public at large) have no adequate remedy at law for the injuries currently being suffered or which will result in the future from DEFENDANTS' continued wrongful conduct in that the agency which purports to regulate such matters is complicit in the wrongs being committed.  In addition, damages flowing from the artificial restraint of the free market as set forth above, are difficult if not impossible to ascertain.  Unless this Court restrains defendants, Plaintiff and members of the public will be forced to institute a multiplicity of suits to obtain compensation.

92.     LINCOLN therefore requests a temporary restraining order, preliminary and permanent injunctions preventing the CBE from approving the MCL and JFKUCOL branch campus requests until the Claims herein may be adjudicated.

**SEVENTH CLAIM FOR RELIEF**

**(DECLARATORY JUDGMENT- CODE CIV. PROC. §1060, et. sec.)**

93.     LINCOLN hereby refers to and realleges the paragraphs 1- 92 (inclusive), and incorporates them by reference as though fully set forth at length herein.

94.     An actual controversy has arisen and now exists between plaintiff LINCOLN and the STATE BAR concerning their respective rights and duties. Plaintiff LINCOLN contends that the system whereby the market participants on the RAC maintain veto power over the ability of a CALS to directly petition the CBE for redress constitutes a violation of the First Amendment right to petition.  The STATE BAR believes that the RAC has no power to actually enact the rules and guidelines and therefore its influence is of no consequence.

95.     A further controversy has arisen and now exists between Plaintiff and the STATE BAR concerning their respective rights and duties. Plaintiff contends that the branch campus Rules and Guidelines are anticompetitive, as applied to areas where an existing CALS operates, thus creating the incentive for monopolization in the manner contemplated by the NU DEFENDANTS' combination and agreements.

96.     A judicial declaration is necessary and appropriate at this time due to (a) LINCOLN's inability to petition the CBE directly for redress; and (b) immediate and irreparable damage to LINCOLN as a result of the intended use of the branch campus guidelines in connection with the JFKU and MCL requests to put branch campuses in San Jose and Santa Cruz in furtherance of the NU DEFENDANTS' conspiracy, and as a result of unfair business practices. If the "no look" approach is allowed in this instance, it must be continued in all other instances, or else LINCOLN will be disproportionately injured.

**WHEREFORE LINCOLN prays for judgment against DEFENDANTS as follows:**

1)     For an order requiring DEFENDANTS to show cause, if any they have, why they should not be enjoined as hereinafter set forth during the pendency of the action;

2)     For a temporary restraining order, a preliminary injunction, and permanent injunction, all enjoining defendants, and each of them, their agents, servants, and employees, and all persons acting under, in concert with, or for them directly or indirectly or in any manner from adopting, participating in, adhering to, applying or enforcing any rule, regulation, agreement, contract, understanding, practice, procedure, or arrangement of any kind or nature whatsoever which has the purpose or effect, directly or indirectly, of approving a branch campus for MCL or JFKUCOL, in any location, including, but not limited to, San Jose and Santa Cruz, until the Claims set forth herein have been adjudicated.

3)     That the Court declare the respective rights and duties of Plaintiff and DEFENDANTS under the regulation in question and that by its declaration and judgment the Court declare that the Rules and Regulations pertaining to branch campuses are anticompetitive as a matter of law.

1    4)    For damages in an amount to be proven at trial, and that such damages be trebled

2  according to statute;

3    5)    For interest, costs and attorney's fees according to proof;

4    6)    For such other and further relief as the Court deems just and proper.

6  DATED:  MARCH 21, 2018                LINCOLN LAW SCHOOL OF SAN JOSE

8                                  BY:  */s/ Laura Palazzolo*
                                       LAURA PALAZZOLO
9                                      ATTORNEY FOR PLAINTIFF

COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF